**In re APEX OIL COMPANY, et al., Debtors.**

**Bankruptcy No. 87–03804–BSS.**

United States Bankruptcy Court, E.D. Missouri, E.D.

Aug. 16, 1990.

See also, Bkrtcy., 111 B.R. 245.

Robert Jay Moore, Howard J. Weg, Gendel, Raskoff, Shapiro & Quittner, Clayton, Mo., Dennis A. Ferrazzano, Barack, Ferrazzano and Kirschbaum, Chicago, Ill., for debtors.

Lloyd A. Palans, Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., Examiner.

Steven N. Cousins, Armstrong, Teasdale, Kramer, Vaughan & Schlafly, St. Louis, Mo., for Unsecured Creditors Committee.

James C. Cole, Office of the U.S. Trustee, St. Louis, Mo.

Leonard Jaques, Alan Kellman, The Jaques Admiralty Law Firm, Detroit, Mich.

Gerald A. Rimmel, Deborah Benoit, Susman, Schermer, Rimmel & Schfrin, Clayton, Mo.

Christian C. Onsager, Faegre & Benson, Denver, Colo.

Stephen Lerner, Bruce Zirinsky, Brian Rosen, Weil, Gotshal & Manges, New York City.

Kenneth J. Mallin, Coburn, Croft & Putzell, St. Louis, Mo.

Michael Reed, Pepper, Hamilton & Scheetz, Philadelphia, Pa.

Robert H. Brownlee, Thompson & Mitchell, St. Louis, Mo., for Chemical Bank.

Roger Ferree, Baker, Hostetler, McCutchen & Black, Los Angeles, Cal.

Clark Oil & Refining Corp., Howard Roin, David Curry, Mary Donohue, Mayer, Brown & Platt, Chicago, Ill.

David A. Warfield, Husch, Eppenberger, Donohue, Cornfeld & Jenkins, St. Louis, Mo.

Joel A. Kunin, Carr, Korein, Tillery, Kunin, Montroy, Glass & Bogard, East St. Louis, Ill.

Douglas Hommert, Lewis, Rice & Fingersh, St. Louis, Mo.

John Evans, Audrey Fleissig, Peper, Martin, Jensen, Maichel & Hetlage, St. Louis, Mo.

Frederick J. Dana, Asst. U.S. Atty., St. Louis, Mo.

## AMENDED OPINION AND ORDER OF CONFIRMATION

BARRY S. SCHERMER, Bankruptcy Judge.

The hearing under section 1128(a) of the Bankruptcy Code and Bankruptcy Rule 3020(b) to consider confirmation of the First Amended Joint Partially Consolidating Plan Of Reorganization Dated February 8, 1990 (the "Plan"), as filed by Apex Oil Company and its 53 affiliated entities (the "Debtors") in its printed form [1], and as modified at and before the entry of the order confirming the Plan (the "Confirmation Order"), commenced on March 28, 1990, when it was continued to April 24, 1990. On that date the hearing was again continued to May 23, 1990. Hearings re-garding the confirmation of the Plan took place on May 23, 24, 29, and 30, July 20, and August 6, 1990. All appearances made at the hearing are identified in the distribution list attached to this opinion. All capitalized terms used herein shall have the meanings set forth in the Plan, unless otherwise defined herein.

Upon consideration of the Plan, the evidence submitted at the confirmation hearing, the arguments of counsel, the memoranda and affidavits filed in support of confirmation of the Plan, all objections to confirmation of the Plan that were timely filed and served and any memoranda or affidavits filed in support thereof, and the records and files in the Reorganization Case, the Court makes the following Findings of Fact and Conclusions of Law:

### JURISDICTION

The proceeding with respect to confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L). The Court has jurisdiction over the Debtors' Chapter 11 cases pursuant to 28 U.S.C. §§ 157(a) and 1334, and Local Rule 29 of the United States District Court for the Eastern District of Missouri. The Court is authorized to make the Findings of Fact and Conclusions of Law set forth herein and to enter the Confirmation Order. The Court has jurisdiction over and the authority to approve every provision in the Plan and any amendment or modification thereto. The Court further finds that the Debtors qualify as "debtors" pursuant to section 109 of the Bankruptcy Code and are appropriate proponents of the Plan under section 1121(c) of the Bankruptcy Code.

### FACTS

A. General Facts

Each of the Debtors, other than Novelly Oil Co. and Goldstein Oil Co., filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on December 24, 1987. Novelly Oil Co. and Goldstein Oil Co.

---

1. The Plan proposed by the Debtors is the only plan of reorganization that has been presented for confirmation in this case. Thus, section 1129(c) of the Bankruptcy Code is not applicable to this proceeding.

filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on October 11, 1988. The Debtors' Chapter 11 cases have been procedurally consolidated and jointly administered. The Debtors have continued to operate their businesses during the reorganization case as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. All of the Debtors are wholly-owned direct or indirect subsidiaries of Apex Oil Company except that: 1) Debtors Novelly Oil Co. and N.I.C. Holding Company are wholly-owned subsidiaries of Non–Debtor Affiliate N. Oil Company; 2) Debtors Goldstein Oil Co. and G.I.C. Holding Company are wholly-owned subsidiaries of Non–Debtor Affiliate S.C.R. Investment Co.; and 3) Debtor Glacier Bay Transportation Corporation is owned 81% by Debtor Trinidad Corporation and 19% by Marine Investment Company of Delaware.

On August 4, 1988, this Court entered an Agreed Order pursuant to which the Debtors, Clark Oil Trading Company ("COTC"), and the Secured Lender Group settled certain significant and fractious claims among them relating to substantive consolidation of COTC into the Debtors' Estates. The settlement, among other things,

1. contributed to the stabilization of the Debtors' operations;

2. eliminated certain significant Claims of COTC against the Debtors;

3. provided for the release of COTC from Claims that could be asserted by the Debtors and their Estates or the Secured Lender Group; and

4. provided for certain significant payments by COTC to the Debtors, including the payment on a monthly basis of the greater of $125,000 or 35% of COTC's Cumulative Net Profit. The payments were to terminate upon confirmation of a plan of reorganization.

On November 8, 1988, the Court entered its Order And Judgment Authorizing And Approving Apex's Execution, Delivery And Performance Of Asset Purchase Agreement And Note Purchase Agreement With AOC Acquisition Corporation, pursuant to which the Asset Sale to AOC under the AOC Acquisition Agreement was approved. The Asset Sale closed on November 22, 1988, and cleared the way in the case for the negotiation, proposal, and confirmation of the Plan by, among other things,

1. giving control over the more than $500,000,000 in secured claims of the Secured Lender Group and Mellon Bank, N.A. to the Debtors, their Estates, and certain Non–Debtor Affiliates, as their interests appeared in the assets that were transferred to AOC in connection with the Asset Sale;

2. providing for AOC's assumption of certain significant liabilities of the Debtors, the settlement of certain significant Claims against the Debtors at the expense of AOC, and

3. obtaining the payment of approximately $25,000,000 in cash, including the guaranty of a certain minimum level of retained working capital sufficient to maintain the Debtors' operations.

On June 14, 1989, the Examiner filed his "Statement Of Investigation Of Causes Of Action Available To The Estates" which, as later supplemented and amended, became the "Examiner's Report" (the "Report"). In the Report, the Examiner concluded that although the Debtors' Estates had several possibly meritorious Claims against certain Non–Debtor Affiliates, protracted litigation of these Claims was not in the best interest of the Estates and their creditors. Thus, the Report contained a strong recommendation that the Claims be settled rather than litigated. Certain Non–Debtor Affiliates subsequently filed their responses to the Report (as later supplemented and amended, the "Responses"), denying almost every allegation and conclusion made in the Examiner's Report and challenging the legal analysis relied upon by the Examiner in reaching his conclusions.

Between March 28 and April 10, 1990, the Debtors filed, in final, printed form, the Disclosure Statement–Information Regarding The Debtors' First Amended Joint Partially Consolidating Plan Of Reorganization Dated February 8, 1990 (the "Disclosure

Statement"), the Plan, the Ballots For Classes and the accompanying Instructions (the "Ballots"), and The Summary Of The Plan And Disclosure Statement (the "Summary"). This Court held that the Disclosure Statement and the Summary contained adequate information within the meaning of section 1125 of the Bankruptcy Code. On May 30 and 31, 1990, the Debtors filed the Trust Indenture and the Memorandum of Undertaking. On August 6, 1990, the Creditors' Committee (the "Committee") stated on the final day of the confirmation hearing that both were acceptable in form and substance.[2] On July 19, 1990, the Debtors filed the Disbursing Agent Agreement. This, too, proved reasonably acceptable in both form and substance to the Committee.

■ Copies of the Disclosure Statement, the Summary, the Ballots, and the Disclosure Order were properly and timely mailed to all known creditors, equity security holders, and other parties in interest in accordance with the Disclosure Order. Notice of the hearing on the confirmation of the Plan was published in appropriate newspapers of local and national circulation. Thus, the Court finds that the Debtors have complied with all necessary procedural requirements related to the above documents as prescribed by the Bankruptcy Code.

B. Objections to Confirmation

Prior to the confirmation hearing, numerous parties filed objections (and in certain instances supplemental objections) to the Debtors' Plan. Those raising such objections are as follows:

1. Banque Paribas;

2. Jackie DeGraw;

3. Four Hundred Seven (407) individuals on whose behalf the Maritime Asbestosis Legal Clinic ("MALC"), a division of the Jaques Admiralty Law Firm, has filed asbestos-related personal injury claims (collectively the "Asbestosis Claimants")

4. Merrill McGahan, *et al.* (collectively the "Alaska Claimants")

5. Northwestern National Insurance Company ("Northwestern National");

6. State of Ohio, Bureau of Workers' Compensation ("State of Ohio");

7. Texas Eastern Products Pipeline Company ("Texas Eastern");

8. United States Department of the Interior, Office of Surface Mining ("Department of the Interior");

9. Lonnie Barrier, Richard Bullock, Danny Cline, Terry Davis, Harold Hall, Robert Jenkins, Dale Severs, and Marcella Wallace (collectively the "Maritime Claimants");

10. Chemical Bank, as indenture trustee ("Chemical");

11. Clark Oil & Refining Corporation, formerly known as AOC Acquisition Corporation ("Clark");

12. Ergon's General Store, Inc., d/b/a Ergon Marine & Industrial Supply ("Ergon");

13. Marine Investment Company of Delaware, Alaska Bulk Carriers, Inc., Sun Transport, Inc., and Sun Refining & Marketing Company (collectively the "Sun Affiliates"); and

14. Transamerican Natural Gas Corporation ("Transamerican").

■ The Department of the Interior withdrew its objection on its own motion. The objections filed by Jackie DeGraw, the State of Ohio, the Maritime Claimants, Ergon, the Sun Affiliates, and Transamerican have been withdrawn pursuant to stipulation and orders approved by this Court.[3]

---

**2.** All references to any of the documents listed above shall be deemed to refer to the document originally filed with the Court in its final printed form. Each of the documents listed above contains certain changes from the form of the document that originally was approved by the Court. These changes are minor, immaterial, and do not adversely affect any creditor, equity security holder, or other party in interest.

**3.** In addition, the Motion to Enlarge Time For Submitting Ballots filed by the Maritime Claimants has been withdrawn pursuant to a stipulation and order approved by this Court. Pursuant to a stipulation announced at the confirmation hearing and approved by this Court, the Motion For Allowance of Claim For Purposes of Acceptance or Rejection of Proposed Plan, filed by the Federal Deposit Insurance Corporation

Although Northwestern National filed an objection to the Plan, it has never appeared before this Court and has done nothing in furtherance of the prosecution of its objection. The Court deems such objection abandoned. Finally, the Creditors' Committee recommended acceptance of the Plan and urged the Court to confirm the Plan.

### 1. *Individual Objections*
#### a. Clark

■ On April 23, 1990, this Court entered an order allowing Clark an administrative priority Claim of approximately $7.8 million. On May 30, 1990, this Court denied the Debtors' Motion to Alter or Amend Judgment regarding that decision. Clark has filed an objection to the Plan, claiming that the document essentially ignores Clark's priority Claim. Clark argues that while the Debtors concede that Clark's post-petition administrative expense Claim must be paid in full, the Plan makes no provision to assure the availability of funds to satisfy the Claim. In support of this proposition, Clark notes that the Plan contemplates a commitment of virtually all of the Debtors' unencumbered assets to secure both the notes to be issued for the benefit of general unsecured creditors and working capital financing. Thus, Clark argues that the Debtors have left no assets available for securing the additional financing necessary to satisfy the Clark Claim on the Effective Date. Such treatment of its Claim, Clark asserts, indicates that the Plan suffers from two deficiencies: 1) it is not feasible, and 2) it undermines the priority of Clark's Claim.

In a subsequent amendment to the Plan, section 11.1.10 states that as a condition of the Plan's becoming effective, COTC must pay in full or post either a bond or a letter of credit for the benefit of Clark which either satisfies Clark or is approved by this Court. This Court finds that this amendment amply provides for the Clark Claim and complies with the terms of section 1129(a) of the Code. Thus, the objection of Clark is moot and it will not be considered further.

#### b. Chemical

Pursuant to a written stipulation and order and an oral stipulation on the record, all of the objections filed by Chemical have been withdrawn, including its objection regarding the feasibility of the Plan, as required pursuant to section 1129(a)(11) of the Bankruptcy Code. On June 28, 1990, this Court, citing the Debtors' inability to obtain financing due to a host of unfulfilled conditions imposed by the lenders, issued a First Amended Memorandum Opinion and Order denying, without prejudice, the Debtors' Motion for Confirmation and continuing the hearing on such Motion to July 20, 1990. In addition to denying the Debtors' motion, the Court requested that on July 17, 1990 Examiner Lloyd Palans submit a report regarding the status of the Debtors' attempt to obtain the financing necessary to fund the Plan. Based on the content of the report and the accompanying testimony of the Examiner, Chemical has subsequently withdrawn its objection regarding the feasibility of the Plan.

#### c. Banque Paribas

Registering similar concerns, Banque Paribas announced at the confirmation hearing that its objection should be deemed withdrawn upon a finding by this Court that the Plan is feasible under section 1129(a)(11) of the Bankruptcy Code. Upon entry of this Order, the objection of Paribas' is deemed moot. Thus, other than as regarding feasibility of the Debtors' proposed Plan, there remain two objectors to the Debtors' Plan—the Alaska Claimants and the Asbestosis Claimants.

(Liberty Federal Savings Bank) (the "FDIC") was resolved by temporarily allowing the FDIC a Class 2E Claim in the amount of $175,000 and a Class 3B Claim in the amount of $331,530.93 for voting purposes only under Bankruptcy Rule 3018(a). The Joint Motion of United States and State of California For Extension of Time to File Requests For Payment of Administrative Expenses, as amended, was withdrawn by the moving parties on their own motion by a letter dated May 17, 1990 and approved by this Court.

#### d. The Alaska Claimants

The Alaska Claimants[4], who have been classified in the Plan as Class 3B Claimants, assert the following arguments:

1. The Plan violates 11 U.S.C. §§ 1123(a)(1), (3) and (4) and 1129(a)(1), (2) and (3) because it classifies Claims for punitive damages in the same class as general unsecured Claims, but provides different treatment for such Claims without the agreement of those Claim holders;

2. In the alternative, the Plan violates 11 U.S.C. §§ 1122(a), 1123(a)(1), (3), and (4), and 1129(a)(1), (2), and (3) by failing to designate a separate class for punitive damage Claims;

3. The Plan violates 11 U.S.C. § 1129(a)(2) and (3) because the misclassification of punitive damages is an impermissible attempt to cram down these claimants using the votes of the Class 3B creditors who receive payment under the Plan;

4. The Plan does not meet the requirements of 11 U.S.C. § 1129(a)(8) because the class of creditors that includes the Alaska Claimants has not accepted the Plan and is impaired.

5. The Plan violates 11 U.S.C. §§ 1129(a)(1) and 1129(b)(1) by unfairly discriminating in its treatment of said Claims. Such Claims should be (and are indeed) classified on a par with general unsecured Claims, yet are to receive no distribution. Moreover, the Alaska Claimants are unfairly discriminated against because they are not allowed to elect to become Releasing Creditors and to share in the payments by the Funding Entities with regard to their punitive damage Claims.

6. As holders of punitive damage Claims, the Alaska Claimants are members of a class deemed to have rejected the Plan under 11 U.S.C. § 1126(g) because the Plan provides that the holders of such Claims are not entitled to receive or retain any property under the Plan on account of such Claims.

7. The Plan violates 11 U.S.C. §§ 1129(a)(1), (2), and (3) and 1129(b) and is not fair and equitable because the holders of Claims or Interests that are junior to the punitive damage Claims of the Alaska Claimants will receive or retain under the Plan property on account of such Claims or Interests. The Plan is generally not fair and equitable because it proposes to discharge the punitive damage Claims without payment, while rewarding the transgressors.

In short, the Alaska Claimants argue that if the Plan subordinated punitive damage Claims to other general unsecured Claims, which it does not, the Plan would have a new, subordinate, nonaccepting class of unsecured Claims. Thus, they argue that the Plan as modified would not be confirmable because the Debtors' equity holders' retention of their Interests allegedly would contravene the absolute priority rule of section 1129(b).

#### e. The Asbestosis Claimants

The Plan also proposes to classify the Asbestosis Claimants'[5] Claims as Class 3B unsecured allowed Claims. They raise objections regarding both their classification under the Plan and the Plan's treatment of punitive damages. Regarding the issue of classification, the Asbestosis Claimants assert that the proposed Plan violates 11 U.S.C. § 1122(a), which provides that a plan "may place a claim ... in a particular class only if such a claim ... is substantially similar to the other claims ... of such class". The Asbestosis Claimants argue that they are, by nomenclature and class, distinct and distinguishable from others in their current class. Thus, they argue that

**4.** Merrill McGahan, *et al.* is a class consisting of 797 claimants who hold both compensatory and punitive Claims against the Debtors arising out of the discharge of crude oil from the tanker SS Glacier Bay into the waters of Cook Inlet, Alaska.

**5.** This class consists of approximately 407 persons who allege that they suffered injuries due to their exposure to asbestosis while employed on ships which were either owned or operated by various Debtor entities. Currently there is litigation regarding these Claims pending in the United States District Court for the Western District of Ohio which has been halted due to the bankruptcy proceedings in this case.

they should be placed in their own, distinct class for six reasons.

First, should their litigation prove successful, the Asbestosis Claimants will be paid through the insurance proceeds of various Protection and Indemnity Clubs. Because other Class 3B creditors will be paid with assets of the Debtors, the Asbestosis Claimants argue that these remedies are clearly separate and distinct. In support of their position, they point to the separate classification of the "Aspen and Admiralty Bay Allowed Claims", which are non-priority Unsecured Allowed Claims placed in their own class (Class 3E) based on anticipated indemnification "by contract, operation of law or otherwise". Disclosure Statement, Section V, C at 58.

Second, the Asbestosis Claimants argue that they are not of the same rank as the other Class 3B claimants. While the remaining Class 3B claimants will receive between an estimated 55 to 80 percent of their Allowed Claims, the Asbestosis Claimants would receive 100 percent of theirs, assuming the existence of insurance proceeds. Third, unlike trade creditors, who have an ongoing interest to create goodwill and to continue to do business with the Debtors, the Asbestosis Claimants have no future stake in the Debtors. Fourth, the Asbestosis Claimants state that the purpose of placing Claims of a substantially similar nature in the same class is to ensure that the votes cast by the class will reflect their joint interest. *In re Butler, Jr.*, 42 B.R. 777, 782 (Bankr.E.D.Ark.1984). However, unlike the Asbestosis Claimants, who are interested in protecting their rights to payment by the Protection and Indemnity Clubs, other Class 3B members have no such interest. Fifth, the Asbestosis Claimants argue that they are misplaced and disenfranchised from a meaningful vote in the Plan process. While the Debtors estimate that the Asbestosis Claimants will receive as little as one percent of the amount to be paid to Class 3B claimants, trade creditors will receive well over 90%. Disclosure Statement, Sec. IV, D., Table 10, at 80. Because the positions of the Asbestosis Claimants and the Debtors differed considerably regarding the val-

ue of the Claims, it is in the Debtors' interest to disenfranchise them. This action, the Asbestosis Claimants argue, cannot be tolerated and is legally impermissible. *In the Matter of U.S. Truck Company*, 42 B.R. 790, 795 (Bankr.E.D.Mich. 1984). In their final argument, addressing the issue of punitive damages, the Asbestosis Claimants argue that while the Plan provides for no distribution for punitive damages, the Debtors have offered no authority to support this exclusion. Because such damages are not expressly disallowed pursuant to sections 501 and 502 of the Bankruptcy Code, the Asbestosis Claimants argue that the Plan violates 11 U.S.C. § 1129(a)(1).

Thus, the main issues which this Court must consider concern the classification and treatment of persons holding Claims for punitive damages, the propriety of the substantive consolidation of the Debtor entities, and the feasibility of the Plan. These issues shall be addressed in the remainder of this opinion as the Court determines whether the Plan meets all of the requirements enumerated in 11 U.S.C. § 1129(a).

## DISCUSSION

### A. Requirements of 11 U.S.C. § 1129(a)

1. *Section 1129(a)(1)—Compliance With Applicable Title 11 Provisions*

 a. Substantive Consolidation

The assets, liabilities, and businesses of the Consolidated Debtors were essentially inseparable prior to the commencement of the respective Consolidated Debtors' Chapter 11 cases and have remained so during the pendency of their Chapter 11 cases. The Consolidated Debtors' businesses were and are mutually dependent, vertically integrated, and operated, in many respects, as segments of a single common enterprise. Most, if not all, of the Consolidated Debtors had many of the same officers, directors, and employees, and operated out of the same business offices. Certain aspects of the dealings among the Consolidated Debtors lacked complete

arms-length formality. The Consolidated Debtors issued financial statements that were prepared on a consolidated basis. The Consolidated Debtors also cross-guaranteed and cross-collateralized each other's debts. Most of the Consolidated Debtors also filed consolidated federal income tax returns and are severally liable for obligations thereunder.

Certain circumstances also prove the difficulty of treating the various Debtors as separate, individual entities. The Asset Sale to AOC resulted in an assignment to Debtor Apex Oil Company (now known as "Novelly/Goldstein Partnership") for the benefit of the selling Debtors and their Estates and certain Non–Debtor Affiliates, as their respective interests may appear, of the Claims of the Secured Lender Group and Mellon Bank, N.A. (approximately $511,000,000 at closing) and the Liens that secure those Claims against the Debtors. Determining the respective Claims against and among the Debtors and Non–Debtor Affiliates arising from the Asset Sale to AOC and other pre-petition and post-petition intercompany transactions and otherwise separately accounting for the separate assets, liabilities, and businesses of the Consolidated Debtors would be impracticable, if not impossible, under the circumstances.

Thus, based on the above examples, this Court agrees with the Debtors that the substantive consolidation provided for in section 5.1 of the Plan is necessary and appropriate to avoid:

(a) any potential prejudice to the creditors of the Estates of the Consolidated Debtors whose assets otherwise may be subject to Intercompany Allowed Claims and to the administrative expenses of determining and litigating those Claims;

(b) the possibility that, given the joint secured and priority obligations of the Consolidated Debtors, creditors similarly situated will be treated differently in a liquidation, as compared with the treatment they will receive in the reorganization under the Plan; and

(c) the enormous economic burden and delay imposed by the process of accu-

rately separating the pre-petition assets and liabilities of the Consolidated Debtors and accounting properly for pre-petition intercompany transfers, which process could seriously reduce, if not eliminate, the value of the Estates of the Consolidated Debtors to their unsecured creditors even if, in the end, a fair reflection of the separate financial condition of each Consolidated Debtor were possible.

In the latter case, this Court doubts that such a fair reflection could ever be achieved.

Section 5.1 of the Plan proposes the substantive consolidation of the Consolidated Debtors, which is described at length in the Disclosure Statement. Unsecured creditors in Class 3B as a whole voted overwhelmingly both in amounts and numbers to accept and approve the Plan. On a Consolidated Debtor-by-Consolidated-Debtor basis unsecured creditors in Class 3B also voted overwhelmingly, both in amounts and numbers, to accept and approve the Plan. The only two exceptions as to numbers were Debtors Trinidad Corporation and Mathiasen's Tanker Industries, Inc., which were based on the number of (but not the amount of) rejection votes received from certain asbestosis claimants after their Claims were temporarily allowed by the Court for voting purposes at $1 each. However, the failure to carry separately the Class 3B vote with respect to Trinidad and Mathiasen's is not grounds to deny confirmation of the Plan because the Plan provides for the substantive consolidation of these two entities in accordance with section 5.1 of the Plan. The Court believes, upon review of the evidence, that Trinidad and Mathiasen's should be substantively consolidated, along with all of the other Consolidated Debtors, in accordance with section 5.1 of the Plan. Thus, this Court further finds that the substantive consolidation of the estates of the Consolidated Debtors pursuant to section 5.1 of the Plan is fair and equitable, is necessary and appropriate, is in the best interests of the creditors and Estates of the Consolidated Debtors, and should be approved.

### b. Procedural Compliance

■ The Court finds that the Debtors have complied with each of the procedural requirements as enumerated by the Bankruptcy Code. First, notice of the following dates was adequate and appropriate under the circumstances and satisfied the requirements of the Bankruptcy Code, the Bankruptcy Rules, and all other applicable law, including, but not limited to section 102(1) of the Bankruptcy Code and Bankruptcy Rule 3017:

1. The dates of the hearing on the confirmation of the Plan;
2. The last date and time to file and deliver objections or other responses to the confirmation of the Plan;
3. The last date and time for the Debtors to receive the Ballots;
4. The last date and time to file and deliver objections or other responses and Claims relating to the rejection, assumption, or assumption and assignment of executory contracts and unexpired leases to be assumed or rejected under Article 9 of the Plan; and
5. The last date and time to file and deliver Claims or requests for payment of certain administrative expenses, as designated in the Disclosure Order.

Second, the solicitation of acceptances of the Plan and the elections set forth in the Ballots by the Debtors, the Non–Debtor Affiliates, and the Creditors' Committee complied with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rule 3018, and all other applicable law. The Debtors, the Non–Debtor Affiliates and the Creditors' Committee, and their officers, directors, shareholders, partners, employees, agents, professionals, and representatives, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules. To the extent that they participated in the offer, issuance, sale or purchase of a security offered or sold under the Plan, they acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code and the Bankrupt-cy Rules. Therefore, pursuant to section 1125(e) of the Bankruptcy Code, they are not liable, individually or collectively, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptance or rejection of a plan or the offer, issuance, sale, or purchase of securities. Third, the Disclosure Statement, the Summary, the Ballots, and the Disclosure Order comply with the applicable provisions of Chapter 11 of the Bankruptcy Code and all applicable Bankruptcy Rules, including, but not limited to, section 1125 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018.

### c. Plan Classification And Treatment Of Punitive Damage Claims

The issues regarding the treatment of punitive damages are crucial to the success of the Debtors' Plan. The actual amount of such damages is both unknown and the subject of great controversy. Unless they can determine the amount of punitive damages for which they will be held liable, the Debtors cannot satisfy the feasibility requirement of section 1129(a)(11). Given the uncertainties and the controversy surrounding these Claims for punitive damages, the Debtors believe that the only way they can afford fair treatment to all creditors and achieve a successful reorganization is by providing that no distributions be made for such Claims.

The Debtors claim that pro rata distributions to holders of Claims for punitive damages would significantly diminish the size of the distributions to all other creditors. Substantial sums would have to be reserved to account for the unresolved punitive damage litigation. Thus, they argue that such reserves would leave little or no cash available for unsecured Claims for a significant amount of time. In fact, initial distributions to other unsecured creditors may even have to be postponed indefinitely until the litigation is resolved. Additionally, the Debtors contend that any eventual awards for punitive damages would become Allowed Claims entitled to distribution, which would deplete the resources

available for payment of all Allowed Claims in Class 3B.

Both the Alaska Claimants and the Asbestosis Claimants contend that the Plan's treatment of their Claims for punitive damages violates section 1129(a)(1) because the Debtors have improperly placed them in the same class with other general unsecured Claims in Class 3B. The Alaska Claimants also contend that the Plan is not fair and equitable because Interest holders retain their equity Interests in the Debtors, while holders of punitive damages Claims receive no distribution under the Plan.

### 1) Classification of Claims for Punitive Damages

#### a) The General Classification Scheme

■ In the Plan; the Debtors have devised a classification scheme in which they sought to place together creditors with relatively similar traits. Under the Plan, all priority Allowed Claims of the kind described in section 507(a)(3), 507(a)(4), or 507(a)(6) are classified in Class 1 under section 3.3.1 of the Plan. In accordance with section 4.2.1 of the Plan, these Allowed Claims will be paid in full in Cash on the later of the Effective Date or the date on which a Claim becomes a Class 1 Allowed Claim, unless the holder of such Allowed Claim agrees to a different treatment. Under section 3.4 of the Plan, all pre-petition secured Allowed Claims are separately classified in Class 2A, 2B, 2C, 2D, 2E, 2F, 2G, 2H, 2I, or 2J, and individual Subclasses within each of these Classes. In accordance with section 4.3 of the Plan, each of these separate Classes and Subclasses will receive the individual treatment specified therein. In accordance with section 1122(b) of the Bankruptcy Code, section 3.5.1 of the Plan designates Class 3A as a separate Class consisting only of every pre-petition general unsecured Allowed Claim held by a Releasing Creditor that is $1,000 or less or reduced to $1,000, an amount that the Court approves as reasonable and necessary for administrative convenience. In accordance with section 4.4.1 of the Plan, these Class 3A Allowed Claims will be paid in full in Cash on the later of the Effective Date or the date on which a

Claim becomes a Class 3A Allowed Claim, not to exceed $1,000.

In accordance with section 3.5.2 of the Plan, all pre-petition general unsecured Allowed Claims, including any deficiency Allowed Claims held by secured creditors, are classified in Class 3B, other than such Allowed Claims the holders of which have elected treatment in the administrative convenience Class 3A, the Intercompany Allowed Claims in Class 3C or Class 3D, and the indemnified Allowed Claims in Class 3E. Under sections 3.5.3 and 3.5.4 of the Plan, all Intercompany Allowed Claims are classified in Class 3C or Class 3D. They will receive the treatment specified in sections 4.4.3 and 4.4.4 of the Plan. Under section 3.5.5 of the Plan, all general unsecured Allowed Claims relating to the vessels known as the "Aspen" and the "Admiralty Bay", for which the Debtors are fully indemnified by a third party, are classified in Class 3E. In accordance with section 4.4.5 of the Plan, they will remain unimpaired pursuant to section 1124 of the Bankruptcy Code. Under section 3.6 of the Plan, all Allowed Interests in the Debtors are classified in Class 4. In accordance with section 4.5 of the Plan, they will remain unimpaired pursuant to section 1124 of the Bankruptcy Code.

Class 3B, in which both the Alaska and Asbestosis Claimants are classified, is impaired and, in accordance with section 4.4.2 and the other provisions of the Plan, each holder of a Class 3B Allowed Claim will receive its Pro Rata Share of:

(i) the $2,000,000 First Cash Distribution;

(ii) the $1,000,000 Second Cash Distribution;

(iii) the net Cash proceeds of the Creditors' Committee Litigation provided for in section 5.6 of the Plan;

(iv) the Series A Notes in the principal amount of $20,000,000;

(v) the Series B Notes in the principal amount of $20,000,000;

(vi) the up to $10,000,000 in Cash in Additional Payments provided for in section 5.15 of the Plan;

(vii) the up to $7,000,000 in Cash (less 12% of the amount to be paid to the holders of Class 3A Allowed Claims) to be distributed to the holders of Class 3B Allowed Claims that elect to qualify as Releasing Creditors by agreeing to give the release set forth in section 5.13.1 of the Plan to the Non–Debtor Affiliates and certain other entities; and

(viii) the sum of up to $500,000 in cash, to be distributed to the holders of Class 3B Allowed Claims that elect to qualify as Additional Releasing Creditors by agreeing to give the release set forth in Article 13 of the Plan.

Subject to the "substantially similar" requirement under section 1122(a) of the Bankruptcy Code, the Debtors have broad discretion in designating the Classes under the Plan. When, as here, virtually all third-party pre-petition general unsecured Allowed Claims are classified in a single class, certainly there can be no suggestion that the Debtors are using the classification of Allowed Claims for some ulterior purpose, such as the manipulation of the voting process. If the Debtors had separately classified an objecting unsecured creditor, the Court would be required to find some "unique" interest to justify the separate classification. However, that is not this case. The Debtors have generally followed the preferred course of classifying all pre-petition general unsecured Allowed Claims in one Class. Thus, the Court finds generally that each Allowed Claim or Allowed Interest placed in each Class under the Plan is substantially similar to the other Allowed Claims or Allowed Interests of such Class, as required by section 1122(a) of the Bankruptcy Code.

More specifically, the Court also finds that the Debtors have properly classified the Claims of both the Asbestosis Claimants and the Alaska Claimants. Under section 12.10 of the Plan, all of the claimants in Class 3B that have insurance or indemnity coverage available will receive the benefits of such policies. Only the deductible or self-insured portion of their Allowed Claims will be treated in Class 3B. The Debtor's insurance and indemnity policies generally provide for deductibles ranging from $50,-000 to $250,000. However, the availability of such insurance or indemnity coverage for some of these Allowed Claims does not mean that they are unique, have a different priority against the Consolidated Debtors, or are not substantially similar to the other Allowed Claims in Class 3B. Moreover, the deductible or self-insured portion of each such Allowed Claim will be treated the same as all other pre-petition general unsecured Allowed Claims, with only the exceptions for the administrative convenience Class 3A, Intercompany Allowed Claims, and certain indemnified Allowed Claims. Thus, given this Court's conclusion that the Plan properly classified those claimants holding claims for punitive damages, the remaining issue is whether the treatment afforded those Claims under the Plan is proper and warranted.

b) Treatment of Those Holding Claims For Punitive Damages Under the Plan

■ Section 12.3 of the Plan provides: Except as otherwise ordered by the Bankruptcy Court pursuant to a specific and express written request of the Debtors or the Reorganized Debtors, no distribution shall be made under the Plan on account of any Claim for punitive or exemplary damages or any fine, penalty or forfeiture.

In addition, the compensatory portion of any Claim that also seeks punitive or exemplary damages, if allowed, will qualify for inclusion in Class 3B under the Plan along with all of the other pre-petition, general unsecured Allowed Claims in the reorganization case, other than the Intercompany Allowed Claims in Class 3C and Class 3D and the indemnified Allowed Claims in Class 3E. Furthermore, to the extent there are insurance or indemnity policies available to cover such Allowed Claims, these claimants will receive, like all other holders of Class 3B Allowed Claims, all payments available under such policies pursuant to section 12.10 of the Plan. In fact, the insurance companies under the policies

that cover the Alaska oil spill Claims have posted a separate written undertaking to pay all compensatory Allowed Claims arising from that incident.

The Debtors currently face hundreds of millions of dollars in punitive or exemplary damages or fines, penalties, or forfeitures that have been asserted by hundreds, if not thousands, of claimants. Most of these Claims are unliquidated and disputed by the Debtors and are the subject of litigation pending in other courts from Alaska to Louisiana. They include, for example, both Claims for punitive damages asserted by various plaintiffs in certain litigation pending in Alaska with respect to an alleged oil spill by one of the vessels operated by the Debtors, and asbestosis Claims asserted in various courts by hundreds of individuals that allegedly served on vessels allegedly owned or operated by the Debtors for the past forty or more years. Whether such claimants will be able to establish that the Debtors engaged in the kind of heinous or outrageous conduct that is typically required to justify an award of punitive or exemplary damages ultimately will be determined by the courts where such Claims are being litigated.

Given the above factual scenario, this Court agrees with the Debtors' contention that the Claims for punitive or exemplary damages or fines, penalties or forfeitures that have been asserted against the Debtors are enormous, highly speculative, hotly disputed, and cannot, as a practical matter, be estimated at this time. This creates a number of problems for the Debtors and the Plan. First, compliance with a number of the provisions of section 1129 of the Bankruptcy Code for confirmation of the Plan is rendered impracticable, if not impossible, without section 12.3 of the Plan. Determining both the feasibility of the Plan under section 1129(a)(11) of the Bankruptcy Code and whether the "best interest of creditors test" under section 1129(a)(7) of the Bankruptcy Code has been satisfied would be difficult at best without a provision in the Plan providing that no distributions shall be made under the Plan on account of Claims for punitive or exemplary damages or fines, penalties or forfei-

tures. Moreover, it is questionable whether a disclosure statement with adequate information could ever be distributed to creditors if the Debtors were forced to anticipate the unknown amount of such Claims.

Second, inclusion of the Claims for punitive damages in Class 3B would also serve to prejudice the other members of that class. Class 3B is the Class under the Plan consisting of all pre-petition general unsecured creditors, other than those in the administrative convenience Class 3A, the Intercompany Allowed Claims in Class 3C and Class 3D, and certain indemnified Allowed Claims in Class 3E. Because the treatment of Allowed Claims in Class 3B contains the features of a so-called "pot" plan, there is no assurance that Class 3B Allowed Claims will be paid in full. Therefore, the inclusion of distributions for Claims for punitive or exemplary damages or fines, penalties or forfeitures in Class 3B would alter the Plan and serve only to penalize the other creditors in that Class by potentially severely diluting their recovery—a result fundamentally at odds with the deterrence purposes of punitive or exemplary damages and fines, penalties, or forfeitures.

Third, this Court agrees with the Debtors' argument that the equitable subordination of punitive damage Claims and their separate classification in a hypothetical class, subordinate to Class 3B but with priority over the Allowed Interests in Class 4, would serve no purpose. Under the Plan, Class 3B creditors likely will not be paid in full, and no class junior to Class 3B is receiving or retaining property under the Plan on account of any junior Claim or Interest. The holders of Class 4 Allowed Interests are retaining their Allowed Interests on account of the substantial and necessary new value contributions being provided by the Funding Entities. Thus, the hypothetical subordinate class for punitive damages would receive no distributions under the Plan and, despite the almost inevitable rejection of the Plan by that Class pursuant to section 1126(g), the Plan would

be confirmable under the "cramdown" provisions of section 1129(b).

Finally, the Alaska Claimants' contention that their Claims are not receiving equal treatment with all other Claims in Class 3B is also erroneous. Under the Plan, all Class 3B members receive distributions for the compensatory portion of their Allowed Claims, and no distribution for their punitive damage claims. If the Alaska Claimants obtained judgments for compensatory damages and punitive damages which became Allowed Claims, they, like all other Class 3B members, would receive distributions only for the portion of their Allowed Claims representing compensatory damages. Thus, the Plan treats all claimants holding claims consisting of both compensatory and punitive damages in an equivalent manner and the Alaska Claimants are not the victims of disparate treatment under its provisions.

On August 2, 1990, the Alaska Claimants filed their Supplemental Objection to Confirmation (the "Supplemental Objection"). The specific issues addressed in their memorandum are the classification and treatment to be accorded to the former shareholders of both Clark Oil & Refining Corporation, a Wisconsin Corporation, and Enterprise Development Group, a Massachusetts business trust (collectively the "Former Shareholders").[6] The Alaska Claimants contend that the Plan is not confirmable because the Former Shareholders are either 1) equity security holders whose Interests cannot ride through the reorganization without contravening the absolute priority rule, or 2) unsecured creditors whose Claims must be subordinated to those of all other creditors, including the Alaska Claimants' Claims for punitive/exemplary damages. This Court agrees with the Debtors that this is not a case involving redemption of shares, or any other kind of agreement to repurchase shares. Because the Former Shareholders retain none of the rights of share ownership, they are not equity interest holders in the Debtors' Estates. Thus,

the absolute priority rule is not implicated. Instead, since the Former Shareholders' interests were cancelled, they are unsecured creditors of the Debtors' Estates. Their Claims rank equally with those of all other general unsecured creditors collectively classified in Class 3B.[7] Furthermore, this Court believes that the laws of both the states of Massachusetts and Wisconsin require this result. Thus, the Court deems meritless the arguments proffered by the Alaska Claimants in their Supplemental Objection.

c) Contributions of the Funding Entities

■ Hypothetically, if the Debtors had classified separately in the Plan all Claims for punitive or exemplary damages or fines, penalties or forfeitures in a separate class subordinate to Class 3B but with priority over the Allowed Interests in Class 4, the Plan would still be confirmed. Under the Plan, without the substantial new Cash and other new contributions being provided by the Funding Entities to enable the Reorganized Debtors and Non–Debtor Affiliates to retain their Class 4 Allowed Interests in the Reorganized Debtors, there would be no value available for distribution to the hypothetical class for Claims for punitive or exemplary damages or fines, penalties or forfeitures. Thus, even though this Class would be deemed to reject the Plan under section 1126(g) of the Bankruptcy Code, the Bankruptcy Court would still be required to confirm the Plan under the "cramdown" provisions of section 1129(b)(2)(B)(ii) of the Bankruptcy Code. This is true because the Debtors and Non–Debtor Affiliates holding Interests in Class 4 would be entitled to retain their Interests in the Reorganized Debtors not on account of their Interests in the Debtors, but by reason of the substantial, necessary, and new contributions which the Funding Entities will make to the Consolidated Debtors and to creditors under the Plan.

The Alaska Claimants have argued that the contribution of the Funding Entities is

---

6. See *infra* for a discussion of how such Claims arose and the results of these claimants' balloting on acceptance of the Plan.

7. This Court concludes that the Debtors have properly classified the Claims of the Former Shareholders under Class 3B.

insufficient when compared to the actual going concern value of the Debtor entities. In support of this assertion, the Alaska Claimants elicited the testimony of Mr. Kleeman in an attempt to rebut the valuation completed by the Debtors' expert witness, Mr. Celentano. As was apparent from the testimony of each of the experts, the valuation of a closely-held, private corporation is extremely difficult due to the lack of public market value for the company's shares. Thus, there is a critical reference point that is missing in the valuation analysis which would normally be present in the valuation of a publicly held company. In short, the valuation methodology for closely held corporations depends on the specific facts of that case and there are many accepted valuation approaches.

In the instant case, Mr. Kleeman's valuation differed from that of Mr. Celentano in several respects. First, he did not use the Ibbitson small stock premium in arriving at his discount rate. The Debtors contend that for companies with capital, inclusion of this factor could have raised the discount rate by approximately 5.3%. Second, Mr. Kleeman used a "beta" of 1 to adjust his discount rate. The Debtors argue that while perhaps appropriate for a typical corporation in the marketplace, this methodology is inappropriate for an oil trading company which is coming out of a Chapter 11 bankruptcy. Third, Mr. Kleeman did not use an "alpha" adjustment for what was defined as a nonsystematic risk. Fourth, while Mr. Kleeman included the payments which COTC is scheduled to contribute to the Plan, he did not account for the fact that there was a Series B Note debt in the Debtors. The Debtors contend that Mr. Kleeman did not take into account that there is capital investment necessary to maintain assets, and that such an investment must come out of future earnings. Were Mr. Kleeman to rectify the above shortcomings in his valuation analysis, the Debtors contend that his final valuation figure would fall within the range projected by Mr. Celentano. This figure, the Debtors assert, would prove both that the Funding Entity contributions meet all judicial standards necessary for "cramdown",

and that if there were a subordinate class of punitive damage Claims, there would be no value with which to pay such Claims.

Essentially the Debtors and the Alaska Claimants have compelled this Court to weigh the credibility of the two witnesses and their respective methodologies. While certainly not without flaws, Mr. Celentano's valuation methodology appears to be a careful, reasonable attempt to derive the going-concern value of the Debtors. Little or no evidence presented by Mr. Kleeman convinced the Court otherwise. Additionally, the Court notes Mr. Celentano's two-year working relationship with the Debtors—a period which likely would allow him to gain great familiarity with their daily operations. Mr. Kleeman, on the other hand, was hired to testify shortly before the confirmation hearing was to take place. Furthermore, he failed to interview the Debtors' industry analysts, their accountants, or their management. This, coupled with the flaws in his valuation analysis to which the Debtors pointed, cause the Court to question the completeness and accuracy of his analysis. In short, the Court accepts the valuation of Mr. Celentano as reasonable and concludes that these contributions are not only reasonably equivalent to the value of the Interests being retained, but they are equal to or greater than the value of the Interests being retained. Therefore, no purpose would be served by forcing the Debtors to modify the Plan to create a new class for such Claims.

In summary, it is well-accepted that the Court has the inherent equitable power to disallow, limit, or subordinate Claims for punitive or exemplary damages or fines, penalties or forfeitures. *Matter of Johns–Manville Corp.*, 68 B.R. 618, 627 (Bankr.S. D.N.Y.1986); *In re A.H. Robins Co., Inc.*, 89 B.R. 555, 561 (E.D.Va.1988). Given the posture of the Claims for punitive damages vis-a-vis the Debtors, this Court has little difficulty in concluding that the wielding of such power indeed is warranted in this case. The treatment of Claims for punitive or exemplary damages or fines, penalties, or forfeitures in accordance with section 12.3 of the Plan should be approved if the

Debtors are to be allowed the opportunity provided under Chapter 11 to successfully reorganize and function as viable entities. Every unsecured creditor in Class 3B will be entitled to participate in the specified distributions for Class 3B under the Plan on account of Allowed Claims for compensatory damages. Under section 12.10 of the Plan, they will receive the benefits of all insurance and indemnity policies that cover such Allowed Claims. Under section 12.3 of the Plan, no creditor in Class 3B or any other Class under the Plan will receive any distributions under the Plan on account of any Claim for punitive or exemplary damages or fines, penalties or forfeitures, except to the limited extent permitted under section 12.3 of the Plan. Thus, such treatment does not discriminate unfairly, is fair and equitable, and is consistent with the provisions of sections 1123 and 1129 of the Bankruptcy Code and all other applicable law.

### d) Miscellaneous Issues Concerning 1129(a)(1)

#### (1) *Settlement Of Claims And Rejection Of Contracts*

As permitted by section 1123(b)(3)(A) of the Bankruptcy Code, sections 5.14.1, 5.14.-2, and 7.6 of the Plan provide for the settlement or adjustment of certain claims or interests belonging to the Debtors or their Estates. These settlements or adjustments are valid, binding, enforceable, fair and equitable under the circumstances. The Court deems the dismissal of the Chapter 11 cases of the Dismissed Debtors, N.I.C. Holding Company, and G.I.C. Holding Company, on the Effective Date of the Plan in accordance with section 5.12.1 of the Plan, in the best interests of the creditors and the Estates of both the Dismissed Debtors and the Consolidated Debtors. As permitted by section 1123(b)(2) of the Bankruptcy Code, Article 9 of the Plan provides, subject to section 365 of the Bankruptcy Code, for the assumption, rejection, or assumption and assignment of the executory contracts and unexpired leases of the Consolidated Debtors not previously rejected in the Reorganization Case under section 365

of the Bankruptcy Code. Therefore, the Consolidated Debtors should be authorized, pursuant to section 365 of the Bankruptcy Code, to reject the executory contracts and unexpired leases described in sections 9.1 and 9.3 of the Plan.

In accordance with section 9.1 of the Plan, on February 21, 1990, the Debtors filed with the Court and served on the appropriate parties a Schedule Of Rejected Executory Contracts And Unexpired Leases. On April 18, 1990, the Debtors filed with the Court and served upon the appropriate parties a First Supplemental Schedule of Rejected Executory Contracts and Unexpired Leases. The Debtors subsequently filed and served on the appropriate parties a Second Supplemental Schedule of Rejected Executory contracts and Unexpired Leases. The Debtors filed with the Court a third such document on April 27, 1990. The Consolidated Debtors have determined to reject these executory contracts and unexpired leases and the other executory contracts and unexpired leases described in section 9.1 of the Plan in the reasonable exercise of their business judgment. This Court concludes that rejection of such executory contracts and unexpired leases by the Consolidated Debtors is in the best interests of their Estates and creditors. In addition, no objection to the rejection of such executory contracts and unexpired leases was filed and served in accordance with section 9.2 of the Plan. Relatedly, in accordance with section 9.3 of the Plan, on February 21, 1990, the Debtors filed and served on the appropriate parties a Schedule Of Assumed Executory Contracts And Unexpired Leases. On March 21, 1990, the Debtors filed and served upon the appropriate parties a First Supplemental Schedule of Assumed Executory Contracts And Unexpired Leases. The Debtors have determined to assume or assume and assign these executory contracts and unexpired leases in the reasonable exercise of their business judgment. This Court concludes, based on the evidence presented, that assumption or assumption and assignment of these executory contracts and unexpired leases by the Consolidated Debtors is in the best interest of both their

Estates and the creditors. The requirements for such assumption or assumption and assignment under section 365(b) of the Bankruptcy Code will be satisfied in accordance with section 9.3 of the Plan. No objection to such assumption or assumption and assignment was filed and served in accordance with section 9.3 of the Plan.

### (2) *Impairment Of Classes*

The Court also recognizes the Debtors' compliance with the requirements regarding impairment that are enumerated in the Bankruptcy Code. First, as required by section 1123(a)(2) of the Bankruptcy Code, section 3.2 of the Plan specifies each Class of Allowed Claims and Allowed Interests that is and is not impaired under the Plan. This specification of class impairment and nonimpairment under the Plan complies with section 1124 of the Bankruptcy Code. Second, as required by section 1123(a)(3) of the Bankruptcy Code, Article 4 of the Plan specifies the treatment of each Class of Allowed Claims and Allowed Interests that is impaired or not impaired under the Plan. The Court concludes that the treatment of each Class of Allowed Claims and Allowed Interests under the Plan does not discriminate unfairly and is fair and equitable with respect to each Class of Allowed Claims and Allowed Interests under the Plan. Finally, as required by section 1123(a)(4) of the Bankruptcy Code, Article 4 of the Plan provides the same treatment for each Allowed Claim or Allowed Interest of a particular Class, unless the holder of a particular Allowed Claim or Allowed Interest agrees to a less favorable treatment of such particular Allowed Claim or Allowed Interest.

 Creditors holding Claims which, if allowed, would qualify for inclusion in Class 3B under the Plan had the option to elect voluntarily to become a Releasing Creditor and whether to give the release. If electing to become a Releasing Creditor, the creditor would be entitled to participate in its share of up to an additional $7,000,-000 in Cash (less 12% of the amount paid to holders of Class 3A Allowed Claims), to be paid by the Funding Entities in the manner set forth in section 5.13 of the Plan. The

Ballot for Class 3B, approved after notice and a hearing in the Disclosure Order entered at the conclusion of the hearing on the Disclosure Statement, made it clear that creditors who voted to reject the Plan could not elect to grant the release set forth in section 5.13.1 of the Plan. Thus, they could not participate in the additional consideration available under section 5.13 of the Plan from the Funding Entities for those creditors that elected to grant the release. The Class 3B Ballot also made it clear that creditors voting to accept the Plan or creditors that did not or could not vote on the Plan could elect whether to grant the release. Most creditors elected to give the release. The time to object to these provisions in the Class 3B Ballot was at the hearing on the Disclosure Statement. No such objection was made.

The fact that the Funding Entities have chosen to contribute this additional Cash under the Plan in consideration of the release of other entities, some of which are not participating in providing the additional Cash for the Releasing Creditors, is not legally significant under section 1129 of the Bankruptcy Code. There is no requirement that each entity to be released contribute the additional Cash. Therefore, the release to be given by Releasing Creditors to the Non–Debtor Affiliates and certain other entities under section 5.13.1 of the Plan is valid, binding, and enforceable, and does not conflict with the provisions of section 524(e) of the Bankruptcy Code. In addition, the Funding Entities cannot be compelled to make the release election available to those Class 3B creditors that voted to reject the Plan. It would be incongruous to compel the Funding Entities to make the release payments available under the Plan to those Class 3B creditors who sought to prevent both the confirmation of the Plan and the approval of the release by voting to reject the Plan. There is nothing unfairly discriminatory or less than fair and equitable in making the election to participate or not participate in the release payments available only to those Class 3B creditors that voted to accept the Plan. Because of the "pot" features of the treatment of Allowed Claims in Class 3B under

the Plan and the necessity for complex reserves for Disputed Claims which, if allowed, would qualify for inclusion in Class 3B under the Plan, it is essential for all possible Claims that may participate in Class 3B to be established and specified on or before the Effective Date of the Plan. Therefore, notwithstanding any otherwise applicable law, creditors that filed unsecured proofs of Claim in the Reorganization Case will be deemed to have made a binding election and waiver of any applicable rights to assert a Lien against any property of any Consolidated Debtor or its Estate or any Reorganized Debtor. Additionally, notwithstanding any otherwise applicable law, any creditor that did not timely file a proof of Claim in this case in accordance with orders of this Court, unless such Claim was scheduled by any of the Consolidated Debtors as other than contingent, unliquidated or disputed, shall be forever barred from participating in distributions under the Plan.

In summary, this Court finds that pursuant to section 1141(a) of the Bankruptcy Code, the provisions of the Plan are valid and enforceable and bind the Debtors, the Reorganized Debtors, the Dismissed Debtors, any entity issuing securities under the Plan, any entity acquiring property under the Plan, and any creditor, equity security holder, or general partner in a Debtor. This is true regardless of whether or not the Claim or Interest of such creditor, equity security holder, or general partner is impaired under the Plan, and whether that party has accepted the Plan.

### (3) *Documentary Compliance*

■ This Court finds that the various required documents submitted by the Debtors satisfy the requirements of section 1129(a)(1). First, the Court concludes that the Plan and all transactions contemplated in the Plan and the Disclosure Statement do not have as their principal purpose the evasion or avoidance of any taxes by any means (including, without limitation, securing the benefit of a deduction, credit or other allowance, through the filing of a consolidated return or otherwise, that would not otherwise be enjoyed without the

Plan) or the avoidance of section 5 of the Securities Act of 1933. This includes, without limitation, any direct or indirect acquisition of control of an entity or property of any entity described in the Plan. As required by section 1123(a)(6) of the Bankruptcy Code, section 6.3 of the Plan provides for the inclusion in the Articles of Incorporation of the Reorganized Debtors of a provision prohibiting the issuance of nonvoting equity securities. Second, the Trust Indenture, the Memorandum of Undertaking, the Disbursing Agent Agreement, and the Loan Documents, as filed at or before the entry of the Confirmation Order, and all transactions, documents, instruments, and agreements contemplated under or in connection with these documents, the Plan, the Post–Confirmation Financing, and the Funding Entity Letter of Credit, and any amendments or modifications thereto: 1) satisfy the requirements of the Plan, 2) are reasonably acceptable to the Creditors' Committee, 3) are adequately described in the Disclosure Statement, 4) contain or are governed by such terms as are reasonably necessary or appropriate under the circumstances, and 5) are fair, reasonable, and in the best interest of the Estates of the Debtors, their creditors, and equity security holders. Finally, the execution, delivery and implementation, and the performance of any act referred to in or contemplated by, the Plan, the Trust Indenture, the Memorandum of Undertaking, the Loan Documents, the Post–Confirmation Financing, and any other documents, instruments or agreements, and any amendments or modification thereto, that may be necessary or appropriate, do not violate any applicable provisions of the Bankruptcy Code or the Bankruptcy Rules.

### e) Summary of Section 1129(a)(1)

In summary, the Courts finds that the Debtors' Plan fully complies with 11 U.S.C. § 1129(a)(1). First, as required by section 1123(a)(7) of the Bankruptcy Code, the Plan contains only provisions that are consistent with the interests of both creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under

the Plan and any successor to such officer, director or trustee. As permitted by section 1123(b)(5) of the Bankruptcy Code, the Plan contains other appropriate provisions not inconsistent with the applicable provisions of the Bankruptcy Code. Third, as required by section 1123(a)(5) of the Bankruptcy Code, Articles 5, 6, 7, 8, 9, 10, 11, and 12 of the Plan provide adequate means for the implementation and consummation of the Plan. Finally, as set forth herein, the Plan complies with the applicable provisions of the Bankruptcy Code, including the classification and mandatory and permissive plan content provisions of sections 1122 and 1123 of the Bankruptcy Code.

### 2. *Section 1129(a)(2)—Plan Proponent Compliance With Title 11*

 Section 1129(a)(2) requires that "[t]he proponent of the plan complies with the applicable provisions of this title". The principal purpose of this requirement is to assure that the plan proponent has complied with the disclosure requirements enumerated in 11 U.S.C. § 1125 in connection with the solicitation of acceptances to the plan. 5 *Collier On Bankruptcy*, ¶ 1129.02 (15th ed. rev. 1989). On February 12, 1990, the Court entered its Disclosure Statement Order, specifically finding, after a properly noticed hearing, that the Disclosure Statement and the Summary contained adequate information. Following the entry of the Disclosure Statement Order, the Debtors distributed the Disclosure Statement, the Plan, and the Summary, (or the Summary only, as appropriate), to all members of the following groups:

1. creditors;

2. equity security holders and other parties in interest listed in the Debtors' schedules;

3. persons who filed proofs of Claim or Interest;

4. parties requesting special notice;

5. security holders of record; and

6. other known parties in interest in the reorganization case.

Proof of effective service of those documents, by mail and by publication, on all of the above parties, together with the Disclosure Statement Order and an appropriate Ballot, were filed before the confirmation hearing. Thus, this Court finds that pursuant to section 1129(a)(2) of the Bankruptcy Code, the Debtors, as proponents of the Plan, have complied with the applicable provisions of the Bankruptcy Code, including the disclosure requirements of section 1125 of the Bankruptcy Code.[8]

### 3. *Section 1129(a)(3)—Good Faith*

 Section 1129(a)(3) conditions plan confirmation upon a determination that the debtor has proposed the plan in good faith and not by unlawful means. To satisfy this good faith test, the court should consider whether, in light of the particular facts and circumstances, the plan will fairly achieve a result consistent with the Code. *In re Madison Hotel Associates*, 749 F.2d 410, 425 (7th Cir.1984). The Eighth Circuit has stated that a plan has been proposed in good faith "if there is a likelihood that the Plan will achieve a result consistent with the standards prescribed under the Code". *Hanson v. First Bank of South Dakota*, 828 F.2d 1310, 1315 (8th Cir.1987) (quoting *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr.S.D.N.Y.1984)).

The Debtors' objectives in filing their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code and in proposing and confirming the Plan were and are:

a. To preserve and protect their viable businesses through reorganization under Chapter 11 of the Bankruptcy Code; and

b. To maximize the value of money and property available for distribution to their creditors.

Additionally, no party has made a valid objection to the confirmation of the Plan pursuant to section 1129(a)(3). Thus, for these reasons the Court finds that the Debtors have proposed the Plan in good

---

**8.** Originally objections regarding this section were filed by the State of Ohio, the Maritime Claimants, Chemical, and Jackie DeGraw. Given that each of these objections is no longer before this Court, further discussion of this section is unnecessary.

faith and not by any means forbidden by law, in compliance with that section. *See* Bankruptcy Rule 3020(b)(2).

 4. *Section 1129(a)(4)—Payment For Services In Connection With The Case*

██ Part (a)(4) of section 1129 requires that:

> Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.... .

The Debtors have disclosed payments made or promised for services or costs and expenses in connection with the reorganization case in the Disclosure Statement and other papers which the Debtors have filed. In addition, Article 2 of the Plan describes the administrative expense Allowed Claims and the method for treatment of all such Allowed Claims. Pursuant to this section, any professional employed at the expense of any Estate will be entitled to an allowance of fees and expenses to the extent determined by a final order entered pursuant to section 328, 330, 331, and 503(b)(2) through (6) of the Bankruptcy Code. Further, the holder of such a Claim that becomes an Allowed Claim after the Effective Date shall receive from the Reorganized Debtors cash equal to the amount of such Allowed Claim when it is allowed. The Plan therefore provides that any payment that is to be made or fixed after confirmation is subject to the approval of the Court as reasonable. Based on these facts, this Court concludes that the Debtors' Plan complies with section 1129(a)(4).

 5. *1129(a)(5)—Identity of Directors, Officers, and Insiders*

██ Section 1129(a)(5)(A)(i) and (ii) require the proponent of the plan to disclose the "identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor," and to prove that "the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy". Section 1129(a)(5)(B) requires the proponent of the plan to disclose the "identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider".

Article 6 of the Plan, referring to Article IV of the Disclosure Statement, discusses governance of the Debtors and the Reorganized Debtors. In Article IV the Debtors disclose that Messrs. Novelly and Goldstein will be the sole directors of each of the Reorganized Debtors and Dismissed Debtors, except for GBTC. In addition to Messrs. Novelly and Goldstein, Marine Investment Company, which is a minority shareholder of GBTC, shall be entitled to elect one member of the board of directors of GBTC. Further, Mr. Goldstein will serve as the Chairman of the Board of all the Reorganized Debtors and Dismissed Debtors, except that Mr. Novelly will be the Chairman of the Board of NOC and NIC Holding. Additionally, Messrs. Novelly and Goldstein will continue to be the principal officers and management of the Reorganized Debtors, the Dismissed Debtors, and COTC. Mr. Novelly will serve as President, Chief Executive Officer, and Secretary of each of the Reorganized Debtors and Dismissed Debtors, except that Mr. Goldstein will serve as the President, Chief Executive Officer, and Secretary of GOC and GIC Holding. Mr. Goldstein will serve as Treasurer of each of the Reorganized Debtors and Dismissed Debtors, except that Mr. Novelly will serve as Treasurer of GOC and GIC Holding.

Thus, based on the above disclosures, this Court finds that because the Plan and Disclosure Statement fully disclose the identity and affiliations of the individuals proposed to serve as directors and officer of the Reorganized Debtors, the Debtors have fully complied with section 1129(a)(5). Further, the Debtors, as well the Creditors' Committee, believe that the continued operational control of the Reorganized Debtors and COTC by Messrs. Novelly and Goldstein is essential to their ability to generate

the revenues and profits from their projected financial operations. As such, the continuance in office of Messrs. Novelly and Goldstein is consistent with both the interests of creditors and equity security holders and with public policy, as required in section 1129(a)(5)(A)(ii). Finally, both the Plan and the Disclosure Statement fully disclose that Messrs. Novelly and Goldstein are insiders of the Debtors. As proof of this fact, the Court recognizes that the terms of the Employment Agreements, which were negotiated between Reorganized Apex and Messrs. Novelly and Goldstein and were the subject of extensive negotiations with the Creditors' Committee, are set forth in Article IV of the Disclosure Statement, in compliance with section 1129(a)(5)(B).

6. *Section 1129(a)(6)—Approval of Rate Changes By A Regulatory Commission*

Part (a)(6) requires that,

Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

However, because the Plan does not provide for any rate changes that are subject to the jurisdiction of any governmental regulatory commission after confirmation of the Plan, any issue regarding compliance with this portion of section 1129(a) is not applicable.

7. *Section 1129(a)(7)—Best Interest Of The Creditors*

 Pursuant to part (a)(7), each member of an impaired class of claims or interests must accept the plan, or must receive an amount not less than they would under a chapter 7 liquidation. With the assistance of their professionals, including their oil industry consulting experts, Wright Killen & Co., and their financial advisors, Bear, Stearns & Co., Inc., the Debtors have established that their liquidation analysis

accounts for all material quantifiable assets and liabilities that reasonably can be quantified and analyzed for purposes of applying the "best interest of creditors" test set forth in section 1129(a)(7)(A)(ii) of the Bankruptcy Code. Thus, in the instant case, the holder of each Claim which, if allowed, would qualify for inclusion in Class 2D, 2E, 2F, 2I, 3B, 3C and 3D, will receive or retain under the Plan on account of such Allowed Claim property of a value, as of the Effective Date of the Plan, an amount that is not less than the amount that such holder would so receive or retain if the Consolidated Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date. No election under section 1111(b)(2) of the Bankruptcy Code was made by the holder of any Claim prior to the conclusion of the hearing on the Disclosure Statement on February 12, 1990. Section 1129(a)(7)(B) of the Bankruptcy Code. The Court therefore finds that the Debtors have complied completely with part (a)(7).

8. *Section 1129(a)(8)—Each Class Accepts The Plan Or Is Unimpaired*

a. Class Voting

 On April 2, 1990, the Debtors filed with the Court the Affidavit Of Robert F. Mann Re: Preliminary Computation Of Votes To Accept Or Reject Debtors' First Amended Joint Partially Consolidating Plan Of Reorganization Dated February 8, 1990. On April 20, 1990, the Debtors filed with the Bankruptcy Court the Affidavit Of Robert F. Mann Re: Final Computation Of Votes To Accept Or Reject Debtors' First Amended Joint Partially Consolidating Plan Of Reorganization Dated February 8, 1990, certain exhibits to which were amended during the confirmation hearing to reflect certain stipulated changes of vote. On June 4, 1990, the Debtors filed the Affidavit of Joan M. Wise Re: Changes in Votes Set Forth in Affidavit of Robert F. Mann Re: Final Computation of Votes to Accept or Reject Debtors' First Amended Joint Partially Consolidating Plan of Reorganization Dated February 8, 1990.[9] This Court

---

9. On July 17, 1990, the Debtors filed amended schedules to reflect the newly-discovered dis-

puted Claims of former shareholders of Clark Oil & Refining Corporation and Enterprise De-

concludes that the procedures set forth in the Disclosure Statement, the Ballots, the Instructions to the Ballots, the Disclosure Order, the Mann and Wise Affidavits, and all orders of this Court with regard to the distribution, receipt, tabulation and computation of the Ballots, the votes to accept or reject the Plan, including temporary estimations and allowances of Claims for voting purposes, and the elections referred to in the Ballots and the Plan: 1) were properly adopted and followed by the Debtors, 2) were fair, reasonable, adequate, and appropriate under the circumstances, and 3) complied with all requirements under sections 1125 and 1126 of the Bankruptcy Code, all applicable Bankruptcy Rules, and all other applicable law.[10] Finally, each holder of a Claim or Interest that accepted the Plan is deemed to have accepted the Plan as modified at or before the entry of the Confirmation Order. Bankruptcy Rule 3019.

As discussed previously, the Debtors' Plan designates various classes as impaired or unimpaired under the Plan. Section 3.2 of the Plan designates Classes 1, 2A, 2B, 2C, 2H, 2J, 3A, 3E and 4 as not impaired under the Plan. Sections 1123(a)(2) and 1124 of the Bankruptcy Code. Section 3.2 of the Plan designates Classes 2D, 2E, 2F, 2G, 2I, 3B, 3C, and 3D as impaired under the Plan. Sections 1123(a)(3) and 1124 of the Bankruptcy Code. The Debtors are not aware of any Claims which, if allowed, would qualify for inclusion in Class 2I or Class 2J under the Plan. With respect to Class 2E under the Plan, each holder of a Claim which, if allowed, would qualify for inclusion in Subclass (2), (3) or (4), has accepted the Plan. Section 1129(a)(8)(A) of the Bankruptcy Code.

With respect to Class 2D under the Plan:
a. Each holder of a Claim which, if allowed, would qualify for inclusion in Subclass (16), (31), (33), (34), (35), or (36), as described on Schedule 7 to the Plan, does not and cannot qualify for inclusion in such Subclass because, pursuant to section 506(a) of the Bankruptcy Code and section 4.3 of the Plan, the value of the interest of the holder of such Claim, if any, in the appropriate Estate's interest in the property that may secure such Claim, is $0.
b. Each holder of a Claim which, if allowed, would qualify for inclusion in Subclass (2), (3), (7), (9), (10), (14), (20), (21), (37), (40), (41), or (46), has accepted the Plan. Section 1129(a)(8)(A) of the Bankruptcy Code.
c. Each holder of a Claim which, if allowed, would qualify for inclusion in Subclass (30), (42), or (45), has elected to qualify for inclusion in Class 3A under the Plan, an unimpaired Class, in accordance with section 3.5.1 of the Plan.
d. Each holder of a Claim which, if allowed, would qualify for inclusion in Subclass (26) or (27), has elected to qualify for inclusion in Class 3B under the Plan, in accordance with section 3.4.4 of the Plan.

With respect to Class 2F under the Plan:
a. Each holder of a Claim which, if allowed, would qualify for inclusion in Sub-

---

velopment Group that had not tendered their former shares for payment (the "Former Shareholders"). The claims of this group arose under the Articles of Merger of Clark Oil and Refining Corporation Into Apex Acquisition, Inc., dated October 19, 1981, and the Articles of Merger Between Enterprise Development Group and Apex Maryland, Inc., dated August 10, 1982. Pursuant to Court order, balloting regarding these claimholders' acceptance of the Plan took place on approximately July 23, 1990. In total, 308 ballots were mailed to former shareholders of Clark & Refining Corporation, and 851 ballots were mailed to former shareholders of Enterprise Development Group. The final count of such votes, as reflected in the Supplemental Affidavit of Robert Mann Re: Final Computation of Votes to Accept or Reject Debtors' First Amended Joint Partially Consolidating Plan of Reorganization Dated February 8, 1990, filed on August 6, 1990, is as follows:

| Former Clark Oil & Refining Shareholders | | |
|---|---|---|
| | Yes | No |
| Number of Votes | 13 | 0 |
| Amount of Claims | $195,656 | $0 |

| Former Enterprise Development Group Shareholders | | |
|---|---|---|
| | Yes | No |
| Number of Votes | 10 | 0 |
| Amount of Claims | $19,530 | $0 |

10. The Court also concludes that the Claims of the Former Shareholders were properly classified and treated as Claims in Class 3B.

class (1), (3), (4), (5), (11), (12), (13), (15), or (16), as described on Schedule 9 to the Plan, does not and cannot qualify for inclusion in such Subclass because, pursuant to section 506(a) of the Bankruptcy Code and section 4.3 of the Plan, the value of the interest of the holder of such Claim, if any, in the appropriate Estate's interest in the property that may secure such Claim, is $0.

b. Each holder of a Claim which, if allowed, would qualify for inclusion in Subclass (10) or (14), has accepted the Plan. Section 1129(a)(8)(A) of the Bankruptcy Code.

c. Each holder of a Claim which, if allowed, would qualify for inclusion in Subclass (8), has withdrawn its Claim pursuant to an Order of the Court entered on February 23, 1990.

The holder of each Claim which, if allowed, would qualify for inclusion in Class 2G under the Plan has accepted the Plan. Sections 1129(a)(7)(A)(i) and 1129(a)(8)(A) of the Bankruptcy Code. Pursuant to section 3.4.7 of the Plan, Class 2G consists of all Intercompany Allowed Claims based on AOC Transferred Claims that are secured by unavoidable, perfected Liens on property in which any Consolidated Debtor or its Estate has an interest. As of the closing of the Asset Sale, all AOC Transferred Claims and all Liens related thereto were transferred to Debtor Novelly/Goldstein Partnership (formerly known as Apex Oil Company) as the agent for the Debtors and their Estates and certain of the Non–Debtor Affiliates, as their interests appeared in the assets sold to AOC in connection with the Asset Sale. This included, but was not limited to, the Claims and Liens of the Secured Lender Group and Mellon Bank, N.A. Such transfer occurred without the necessity of any further act or notice, or the filing of any document, instrument, or agreement with any entity or the Bankruptcy Court. Thus, in accordance with section 4.3.7 of the Plan, on the Effective Date all Liens on any property of any of the Debtors or their Estates or the Reorganized Debtors that secure any Class 2G Allowed Claim shall be deemed released, abandoned, extinguished, discharged, and

fully satisfied without the necessity of any further act or notice or the filing of any document, instrument or agreement with any entity or with the Court. Finally, Classes 3B, 3C, and 3D under the Plan have accepted the Plan because, as required by section 1126(c) of the Bankruptcy Code, the Plan has been accepted by creditors, other than any entity designated under section 1126(e) of the Bankruptcy Code, that hold at least two-thirds in amount and more than one-half in number of the Allowed Claims of such Class held by creditors, other than any entity designated under section 1126(e) of the Bankruptcy Code, that have accepted or rejected the Plan. Section 1129(a)(8)(A) of the Bankruptcy Code.

9. *Section 1129(a)(9)—Payment of Administrative and Priority Claims*

█ As required by section 1123(a)(1) of the Bankruptcy Code, Article 3 of the Plan designates Classes of Claims, other than Claims of a kind specified in section 507(a)(1), 507(a)(2), or 507(a)(7) of the Bankruptcy Code, and Classes of Interests. Claims of a kind specified in section 507(a)(1) or 507(a)(7) are addressed in Article 2 of the Plan. There are no Claims of a kind specified in section 507(a)(2) or (a)(5) of the Bankruptcy Code in this case.

Section 2.2 of the Plan provides that, with respect to an Allowed Claim of a kind specified in section 507(a)(1) of the Bankruptcy Code, the holder of such Allowed Claim will receive on the Effective Date, on account of such Allowed Claim, Cash equal to the allowed amount of such Allowed Claim, except to the extent the holder of such Allowed Claim has agreed to a different treatment. Section 1129(a)(9)(A) of the Bankruptcy Code. Section 2.3 of the Plan provides that, with respect to an Allowed Claim of a kind specified in section 507(a)(7) of the Bankruptcy Code, the holder of such Allowed Claim will receive on account of such Allowed Claim, either Cash on the Effective Date of the Plan equal to the allowed amount of such Allowed Claim, or deferred Cash payments, over a period not exceeding six years after the date of as-

sessment of such Allowed Claim, of a value, as of the Effective Date of the Plan, equal to the allowed amount of such Allowed Claim, except to the extent the holder of such Allowed Claim has agreed to a different treatment. Section 1129(a)(9)(C) of the Bankruptcy Code. Sections 3.4.1 and 4.2.1 of the Plan provide that, with respect to an Allowed Claim of a kind specified in section 507(a)(3), 507(a)(4), or . 507(a)(6) of the Bankruptcy Code, the holder of such Allowed Claim will receive, on the Effective Date on account of such Allowed Claim, Cash equal to the allowed amount of such Allowed Claim, except to the extent the holder of such Allowed Claim has agreed to a different treatment. Section 1129(a)(9)(B) of the Bankruptcy Code. The Court finds each of these provisions to be in compliance with section 1129(a)(9).

Finally, Clark had raised an objection regarding the Plan's allegedly inadequate provision for its approximately $7.7 million administrative Claim. The Debtors have since modified the Plan, and have provided in section 11.1.10 that as a condition of the Plan's becoming effective, COTC shall either pay the Claim in full or post a bond or a letter of credit to Clark's benefit which Clark agrees is satisfactory or which this Court has approved. The Court deems this provision for Clark's administrative Claim satisfactory and in full compliance with the requirements of section 1129(a)(9).

### 10. Section 1129(a)(10)—Acceptance Of The Plan By One Impaired Class

As permitted by section 1123(b)(1) of the Bankruptcy Code, the Plan impairs or leaves unimpaired each Class of Allowed Claims and Allowed Interests. However, because the members of Class 3B have chosen to accept the Plan, this Court concludes that the Debtors have satisfied this section's requirement that at least one Class of Allowed Claims that is impaired under the Plan has accepted the Plan, as determined without including any acceptance of the Plan by any insider.

### 11. Section 1129(a)(11)—Feasibility

Referred to as the "feasibility test", section 1129(a)(11) requires the Court to determine that,

confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan. 11 U.S.C. § 1129(a)(11).

To satisfy the feasibility requirement, the Debtors need to establish only that the Plan has a reasonable probability of success. As a leading bankruptcy treatise states:

Basically, feasibility involves the question of the emergence of the reorganized debtor in a solvent condition with reasonable prospects of financial stability and success. It is not necessary that success be guaranteed, but only that the Plan present a workable scheme of organization and operation for which there may be a reasonable expectation of success. 5 *Collier On Bankruptcy*, ¶ 1129.02[11] at 1129–36.11 (15th ed. rev. 1989).

Numerous decisions are in accord with this interpretation. *See, e.g., In re Acequia, Inc.*, 787 F.2d 1352, 1364 (9th Cir.1986); *In re Pike's Peak Water Co.*, 779 F.2d 1456, 1460 (10th Cir.1985). Thus, the issue arising under section 1129(a)(11) is not whether the success of the plan can be guaranteed. Instead, the Debtors must prove that the Plan "offers a reasonable prospect of success and is workable". *In re Monnier Bros.*, 755 F.2d 1336, 1341 (8th Cir.1985) (quoting *United Properties, Inc. v. Emporium Department Stores, Inc.*, 379 F.2d 55, 64 (8th Cir.1967)). In making this determination, courts often consider the experience and ability of management, the adequacy of capital resources, and reasonably anticipated liquidity. *See United Properties, supra* at 68–70; *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 151 (Bankr. S.D.N.Y.1984).

#### a. The Debtors' Business Plan

The Debtors and COTC, with the assistance of their professionals, including

their oil industry consulting expert, Wright Killen & Co., Inc. and their financial advisors, Bear, Stearns & Co., have prepared a five year business plan for the operation of the Reorganized Debtors' and COTC's businesses after the Effective Date of the Plan (the "Business Plan"). The Reorganized Debtors expect to dispose of certain assets identified in the Business Plan and in section IV–C of the Disclosure Statement. In addition, as described in section VIII–A–1 of the Disclosure Statement, the net proceeds from the disposition of certain of these assets will be paid under the Trust Indenture to the holders of the Series A Notes to be issued under the Plan and the Trust Indenture. The Debtors, with the assistance of their professionals, including their financial advisors, Bear, Stearns & Co. Inc., also have prepared ten-year financial projections for the Reorganized Debtors and COTC and the Debtors have established that not only are those projections attainable and reasonable, but also that they evidence the Reorganized Debtors' and COTC's ability to operate after the Effective Date and to meet their obligations under the Plan. In addition to these financial projections, the evidence at the confirmation hearing established the fact that the continued operational control of the Reorganized Debtors and COTC by Messrs. Novelly and Goldstein will enhance the reasonable prospects for success of the Plan. In short, both the Debtors and the Creditors' Committee believe that the participation of these two principals will very likely increase the probability that the revenues and profits from operations that were forecast in the financial projections will be realized.

### b. Financing of the Plan

On June 5, 1990, this Court issued an opinion denying without prejudice the Debtors' motion to confirm the Plan due to the Debtors inability to secure the necessary financing for the Plan. The opinion further ordered the Examiner, Lloyd Palans, to report to the Court on July 17, 1990 regarding the status of the Debtors' negotiations with its lenders. The Examiner filed a report with the Bankruptcy Court on July 13, 1990 with respect to the status of the Loan Documents and the Post–Confirmation Financing and the Examiner and other individuals testified as to the status of the Loan Documents and the Post–Confirmation Financing. Based on the report and the accompanying testimony of the Examiner at the continued confirmation hearing held on July 20, 1990, this Court is convinced that absent unforeseen circumstances, closing of the Debtors' financing will take place 10 days subsequent to the entry of this Order. Furthermore, this Court is confident that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Reorganized Debtors, and such liquidation or reorganization is neither proposed nor contemplated by the Plan. Section 1129(a)(11) of the Bankruptcy Code. Thus, the Court concludes that the Debtors have sufficiently complied with 1129(a)(11).

The commitment letter dated May 23, 1990, (the "Commitment Letter") entered into among Banque Paribas and Banque Indosuez (Geneva) (collectively, the "Banks") and Novelly/Goldstein Partnership, together with the proposed participation agreement (the "Participation Agreement") accepted by Non–Debtor Affiliates Paul A. Novelly and Samuel R. Goldstein (the "Funding Entity Lenders") concurrently therewith, evidence the commitment of the Banks to establish post-confirmation financing to the Reorganized Debtors, on a joint and several basis, in the form of a $45,000,000 working capital facility and the Funding Entity Lenders' commitment to purchase a $15,000,000 subordinated, nonvoting participation therein (the "Post–Confirmation Financing"). At the confirmation hearing, the Debtors made available, introduced into evidence, and distributed to all parties present, copies of the Commitment Letter and the Participation Agreement. The Funding Entity Lenders have established their ability to fund their participation in the Post–Confirmation Financing (Debtors' Exhibits C, D, E, F). In addition, the Debtors also made available, introduced into evidence and distributed to

all parties present, copies of the relevant loan and security documents that will, in substantially the form presented, evidence the Post–Confirmation Financing (the "Loan Documents"). Thus, this Court concludes that the Debtors have established that the Post–Confirmation Financing will be available on and after the Effective Date, and the Debtors have established that the Post–Confirmation Financing will be sufficient to meet the post-confirmation financing needs of the Reorganized Debtors under the Business Plan.

All parties in interest have had a fair and reasonable opportunity to review and examine the Commitment Letter, the Participation Agreement, and the Loan Documents. All material terms and conditions of the financing contemplated by the Commitment Letter, the Participation Agreement, and the Loan Documents were fully disclosed at the confirmation hearing. A representative of Banque Paribas, John L. Hank, treasurer of Apex Oil Company, Inc., and the Examiner each testified at the confirmation hearing concerning the Commitment Letter, the Participation Agreement and the Loan Documents and the Post–Confirmation Financing. All parties in interest had a fair and reasonable opportunity to cross-examine these witnesses regarding the Commitment Letter, the Participation Agreement, the Loan Documents and the Post–Confirmation Financing.

The negotiations among the Banks, the Debtors and Messrs. Novelly and Goldstein concerning the terms of the Commitment Letter, the Participation Agreement, and the Loan Documents and the Post–Confirmation Financing were arms-length, vigorous, open and, oftentimes, difficult. Thus, the lenders under the Commitment Letter, the Participation Agreement, the Loan Documents and the Post–Confirmation Financing are good faith lenders. As a result of these negotiations, the Debtors have fulfilled the requirements dictated by 11 U.S.C. § 1129(a)(11). First, the Memorandum of Undertaking and the form of the Irrevocable Letter of Credit to be issued by Banque Paribas authorizing draws in an aggregate amount not to exceed $20,000,-000 (Debtors' Exhibit B) (the "Funding En-

tity Letter of Credit") establish the ability of the Funding Entities under the Plan to satisfy timely all of their funding obligations under the Plan. Second, the Debtors have established (Debtors' Exhibit AU) that COTC has the ability to obtain the issuance of a letter of credit or the posting of a bond as of the Effective Date of the Plan (the "Clark Bond") to secure payment of the administrative claim of Clark as allowed by the Court, at such time as the order of allowance becomes final. Finally, the Post–Confirmation Financing, the Funding Entity Letter of Credit, and the Clark Bond are sufficient in the aggregate to satisfy all of the financial obligations under the Plan that are due or must be funded as of the Effective Date (Debtors' Exhibit AI).

12. *Section 1129(a)(12)—Payment of Fees Pursuant to 28 U.S.C. § 1930*

All fees payable in this case under 28 U.S.C. § 1930 have been paid or will be paid on the Effective Date of the Plan pursuant to section 2.1 of the Plan.

13. *Section 1129(a)(13)—Continuation of Retiree Benefits*

There are no retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, in controversy in this case. Therefore, the provisions of section 1129(a)(13) of the Bankruptcy Code are not applicable to the Plan.

B. Requirements of 1129(b)

1. *General Requirements*

If the Plan is rejected by an impaired class of claims or interests, the Plan may nevertheless be confirmed under section 1129(b) if all of the requirements of section 1129(a) are met, with the exception of section 1129(a)(8). Known as the "cramdown" provision, section 1129(b) requires that the court confirm a plan if it does not "discriminate unfairly" and is "fair and equitable" with respect to each class that has rejected the plan. 11 U.S.C. § 1129(b)(1). If the plan does discriminate, the court must determine whether the plan discriminates un-

fairly through the following four-part inquiry:

1. whether the discrimination has a reasonable basis;
2. whether the debtors can carry out the plan without discrimination;
3. whether the discrimination proposed is in good faith;
4. whether the degree of discrimination is directly related to the basis or rationale for the discrimination, i.e., does the basis for the discrimination demand that this degree of differential treatment be imposed.

*In re Wolff,* 22 B.R. 510, 512 (9th Cir. BAP 1982); *In re Rochem, Ltd.,* 58 B.R. 641, 643 (Bankr.D.N.J.1985).

Regarding the issue of whether the Plan is fair and equitable with respect to classes of unsecured claims, the Bankruptcy Code sets up separate requirements for such a determination. Sections 1129(b)(2)(B)(i) and (ii) require that,

1. the plan provides that each holder of an unsecured claim receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of the claim, or
2. the holder of any claim or interest that is junior to the claims of such class not receive any property under the plan on account of that claim or interest.

2. *Treatment of Classes Under the Plan*

 With respect to Class 20 under the Plan, each holder of a Claim which, if allowed, would qualify for inclusion in Subclass (1), (4), (5), (11), (12), (17), (18), (22), (24), (28), (29), (38), (43), or (44) did not or was not entitled to vote on the Plan. With respect to such Subclasses, the Plan does not discriminate unfairly and is fair and equitable, in that section 4.3.4 of the Plan provides the holders of the Claims which, if allowed, would qualify for inclusion in such Subclasses, with the treatment set forth in sections 1129(b)(2)(A)(i) and 1129(b)(2)(A)(ii) of the Bankruptcy Code. Subject to the provisions of section 4.3.4 of the Plan, the holder of each Class 2D Allowed Claim shall, unless otherwise ordered by the Court after notice and a hearing, retain the Liens that secure such a Class 2D Allowed Claim against the property that secures such Allowed Claim and receive the deferred Cash payments specified in section 4.3.4 of the Plan. Such deferred Cash payments have a value that total at least the allowed amount of such Allowed Claim as of the Effective Date of the Plan.

 With respect to Class 2E under the Plan, each holder of a Claim which, if allowed, would qualify for inclusion in Subclass (1), did not vote to accept the Plan. With respect to such Subclass, the Plan does not discriminate unfairly, and is fair and equitable, in that section 4.3.5 of the Plan provides the holders of the Claims which, if allowed, would qualify for inclusion in such Subclass, with the treatment set forth in section 1129(b)(2)(A)(iii) of the Bankruptcy Code. Regarding Class 2F under the Plan, each holder of a Claim which, if allowed, would qualify for inclusion in Subclass (2), (6), (7), or (9) did not vote on the Plan. With respect to such Subclasses, the Plan does not discriminate unfairly, and is fair and equitable, in that section 4.3.6 of the Plan provides the holders of the Claims which, if allowed, would qualify for inclusion in such Subclasses, with the treatment set forth in sections 1129(b)(2)(A)(i) and 1129(b)(2)(A)(ii) of the Bankruptcy Code. Subject to the provisions of section 4.3.6 of the Plan, the holder of each Class 2F Allowed Claim shall, unless otherwise ordered by the Court after notice and a hearing, retain the Liens that secure such a Class 2F Allowed Claim against the property that secures such Allowed Claim and receive the deferred Cash payments specified in section 4.3 of the Plan. In each case, such property has a useful life which equals or exceeds the term during which such deferred Cash payments are to be made. Such deferred Cash payments have a value that total at least the allowed amount of such Allowed Claim as of the Effective Date of the Plan.

The foregoing discussion convinces the Court that the Debtors' plan has satisfied the requirements of section 1129(b).[11]

### ORDER

Based on the above findings of fact and conclusions of law, it is ORDERED that:

the Debtors' First Amended Joint Partially Consolidating Plan Of Reorganization Dated February 8, 1990, as filed with the Bankruptcy Court on August 1, 1990, is CONFIRMED.

It is further ORDERED that:

1. The Plan and all transactions, documents, instruments, and agreements referred to therein, contemplated thereunder, or executed and delivered in connection therewith, and any amendments or modifications thereto, are approved.

2. In accordance with section 5.2.5 of the Plan, the confirmation and effectiveness of the Plan and the transactions contemplated in the Plan shall be accounted for by the Reorganized Debtors as a mandated, legal reorganization. On their financial statements as of October 1, 1988, the Reorganized Debtors shall restate their capitalization to effect the elimination of all prior deficits in all capital accounts, by restating all Claims, to the extent they are Allowed Claims, to their fair values as of the Confirmation Date (including the negotiated settlement values, if any, of such Allowed Claims and including the recognition of the partial worthlessness of the Intercompany Allowed Claim against Debtor Novelly/Goldstein Partnership) and by restating all assets of the Reorganized Debtors to the fair values of such assets, not exceeding, in the aggregate, the total value of Allowed Claims, in accordance with generally accepted accounting principles.

3. Pursuant to section 12.4 of the Plan, substantial consummation of the Plan, within the meaning of section 1101(2)(B) of the Bankruptcy Code, shall occur on the Effective Date of the Plan when 1) substantially all of the property proposed to be transferred under the Plan has been transferred to or for the benefit of the entity entitled thereto, 2) the Reorganized Debtors have assumed the businesses of the corresponding Consolidated Debtors and their Estates, and 3) the distributions under the Plan have commenced in the manner provided in the Plan and this Order.

4. This Court shall retain jurisdiction over all matters and proceedings in this case in the manner and to the fullest extent provided in Article 10 of the Plan. Pursuant to Bankruptcy Rule 3020(d), notwithstanding entry of this Order, the Court may enter all Orders necessary to administer the Estates of the Consolidated Debtors.

5. Pursuant to section 5.2.7 of the Plan, all procedures previously adopted or ordered by the Court with respect to the resolution of objections to Claims shall continue in effect after the confirmation or effectiveness of the Plan.

6. The releases set forth in sections 5.13.1, 5.14.1, 5.14.2, 7.6, and Article 13 of the Plan are fair, reasonable, valid, enforceable, and binding in accordance with the Plan.

7. Pursuant to section 5.2.7 of the Plan, except as otherwise provided in the Plan, all claims, proceedings, rights, interests, and causes of action of the Debtors and their Estates shall survive the confirmation and effectiveness of the Plan. As permitted by section 1123(b)(3)(B) of the Bankruptcy Code, sections 5.2.7 and 12.10 of the Plan provide for the retention, enforcement or settlement by the Reorganized Debtors, as representatives of the Estates of the Consolidated Debtors, of all claims, proceedings, rights, interests, and causes of action of the Consolidated Debtors and their Estates, other than the Creditors' Committee Litigation to the extent the Creditors' Committee is designated, as permitted by section 1123(b)(3)(B) of the Bankruptcy Code, as the representative of the Estates of the Consolidated Debtors with

---

11. Regarding the arguments proffered by the Alaska Claimants on the issue of cramdown, see *supra* discussion under section 1129(a).

respect to certain claims, proceedings, rights, interests, and causes of action under section 5.6 of the Plan, and other than claims, proceedings, rights, interests, or causes of action that have been waived, released, compromised, or settled under or in connection with the Plan or otherwise.

8. The Creditors' Committee shall continue in existence on and after the Confirmation Date and on and after the Effective Date, and may continue to retain such professionals as reasonably may be required by the Creditors' Committee to perform its duties under the Plan, subject to and in accordance with the provisions of Article 7 of the Plan.

9. In accordance with section 12.17 of the Plan, all reserves to be established under the Plan or the Trust Indenture shall be made on the basis of the face amount of each Allowed Claim and Disputed Claim, unless otherwise ordered by this Court after notice to the holder of such Allowed Claim or Disputed Claim and other parties in interest.

10. On the Effective Date of the Plan, all publicly-held debt or equity securities issued by any of the Consolidated Debtors or their predecessors in interest or with respect to which any of the Consolidated Debtors or Reorganized Debtors may be liable prior to the Confirmation Date and any publicly-held debt or equity securities issued to replace such publicly-held debt or equity securities, other than such publicly-held debt or equity securities as are held by any of the Debtors or the Non–Debtor Affiliates, shall be deemed to be cancelled, terminated, void, and of no further force and effect, and shall represent only the right, if any, to receive distributions under the Plan in accordance with section 5.11 of the Plan. Any indenture or similar instrument with respect to such publicly-held debt or equity securities shall be cancelled as to the Debtors, the Reorganized Debtors, and the Dismissed Debtors on the Effective Date of the Plan.

11. Pursuant to sections 1141(b) and 1141(c) of the Bankruptcy Code, except as otherwise provided in the Plan, on the Effective Date of the Plan, all property of the Consolidated Debtors and their Estates shall be revested in the corresponding Reorganized Debtors free and clear of any and all Liens, Claims, encumbrances or restrictions, and the Reorganized Debtors shall assume the businesses of the corresponding Consolidated Debtors and their Estates in accordance with section 8.1 of the Plan.

12. Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under the Plan, may not be taxed under any law imposing a stamp tax or similar tax.

13. In accordance with section 8.1 of the Plan, on the Effective Date, the Dismissal of the Chapter 11 cases of the Dismissed Debtors, N.I.C. Holding Company, and G.I.C. Holding Company, pursuant to section 5.12 of the Plan, shall have the effects set forth in section 349 of the Bankruptcy Code, including, but not limited to, revesting property of their respective Estates in N.I.C. Holding Company and G.I.C. Holding Company, respectively.

14. Pursuant to section 1141(d)(1) of the Bankruptcy Code and in accordance with section 8.2 of the Plan, except as otherwise provided in the Plan, the entry of this Order shall, on the Effective Date, discharge and release the Consolidated Debtors and their Estates and all property of the Consolidated Debtors and their Estates, from any and all Claims, debts, and Liens that arose before the Confirmation Date, and any and all Claims and debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, including, but not limited to, any Claim or debt based on a deficiency, whether or not:

a. A proof of Claim based on such Claim or debt is filed or deemed filed under section 501 or 1111(a) of the Bankruptcy Code;

b. Such Claim or debt is an Allowed Claim under the Plan or section 502 of the Bankruptcy Code; or

c. The holder of such Claim or debt has accepted the Plan.

15. Pursuant to sections 105, 524, and 1141 of the Bankruptcy Code and in accord-

ance with section 8.3 of the Plan, the discharge and release provided for under section 1141(d)(1) of the Bankruptcy Code and section 8.2 of the Plan shall have the effects set forth in the Bankruptcy Code, including, but not limited to:

a. Voiding any judgment at any time obtained; to the extent that such judgment is a determination of the personal liability of any of the Consolidated Debtors or any of the Reorganized Debtors on any discharged Claim or debt, whether or not discharge of such Claim or debt is waived;

b. Operating as an injunction against the commencement or continuation of any action, employment of process or any act to collect, recover or offset any discharged Claim or debt, whether or not discharge of such Claim or debt is waived; and

c. Operating as an injunction against the commencement or continuation of any action, the employment of process, or any act to collect, recover, or offset any Claim or debt against any property of the Consolidated Debtors, their Estates, or the Reorganized Debtors, whether or not discharge of such Claim or debt is waived.

16. Pursuant to section 1142(a) of the Bankruptcy Code, notwithstanding any otherwise applicable non-bankruptcy law, rule, or regulation relating to financial condition, the Debtors and the Reorganized Debtors shall carry out the Plan and shall comply with any orders of this Court.

17. Pursuant to section 1142(b) of the Bankruptcy Code, the Court approves, and the Debtors are authorized and directed to execute, deliver, and implement, the Plan, and any other documents, instruments, or agreements, and any amendments or modifications thereto, that may be necessary or appropriate for the implementation or consummation of the Plan.

18. All objections to the confirmation of the Plan that have not been withdrawn are overruled.

19. On the Effective Date of the Plan, the Estates of the Consolidated Debtors shall be substantively consolidated in accordance with section 5.1 of the Plan.

20. On the Effective Date of the Plan, the Chapter 11 cases of the Dismissed Debtors, N.I.C. Holding Company and G.I.C. Holding Company, shall be dismissed in accordance with section 5.12.1 of the Plan.

21. Upon entry of this Order, all executory contracts and unexpired leases of the Debtors to be rejected under section 9.1 of the Plan are rejected. In accordance with section 9.3 of the Plan, any executory contract or unexpired lease that is inadvertently rejected may, subject to the requirements of section 365(b) of the Bankruptcy Code, be assumed pursuant to a Final Order of this Court, entered after the Effective Date of the Plan upon motion to this Court, after notice and opportunity for hearing to all parties entitled thereto.

22. All executory contracts and unexpired leases of the Debtors to be assumed or assumed and assigned under section 9.3 of the Plan shall be unassumed or unassumed and assigned on the Effective Date of the Plan in accordance with section 9.3 of the Plan.

23. Pursuant to section 1142(b) of the Bankruptcy Code, the Court approves, and the Debtors are authorized and directed to perform, any act referred to in or contemplated by the Plan and any other documents, instrument or agreements, and any amendments or modifications thereto, and any other act, including, but not limited to, the execution, delivery, or implementation of any documents, instruments, or agreements, and any amendments or modifications thereto, that may be necessary or appropriate for the implementation or consummation of the Plan.

24. Notwithstanding any otherwise applicable law, creditors that filed unsecured proofs of Claim in the Reorganization Case have made a binding election and waiver of any applicable rights to assert a Lien against any property of the Consolidated Debtors, their Estates, or the Reorganized Debtors.

25. Notwithstanding any otherwise applicable law, any creditor that did not time-

ly file a proof of Claim in the Reorganized Case in accordance with Orders of this Court, unless such creditor's Claim was scheduled by any of the Consolidated Debtors as other than contingent, unliquidated, or disputed, shall be forever barred from participating in distribution under the Plan.

26. On the Effective Date of the Plan, all publicly-held debt or equity securities issued by any of the Consolidated Debtors (or their predecessors in interest) or with respect to which any of the Consolidated Debtors or Reorganized Debtors may be liable prior to Confirmation Date, and any publicly-held debt or equity securities issued to replace such publicly-held debt or equity securities, other than such publicly-held debt or equity securities as are held by any of the Debtors or the Non–Debtor Affiliates, shall be deemed to be cancelled, terminated, void, and of no further force and effect, and shall represent only the right, if any, to receive distributions under the Plan in accordance with section 5.11 of the Plan. Any indenture or similar instrument with respect to such publicly-held debt or equity securities shall be cancelled as to the Debtors, the Reorganized Debtors, and the Dismissed Debtors on the Effective Date of the Plan.

27. Pursuant to section 1141(a) of the Bankruptcy Code, the provisions of the Plan are valid and enforceable and bind the Debtors, the Reorganized Debtors, Dismissed Debtors, any entity issuing securities under the Plan, any entity acquiring property under the Plan, and any creditor, equity security holder, or general partner in a Debtor, whether or not the Claim or Interest of such creditor, equity secured holder, or general partner is impaired under the Plan and whether or not such creditor, equity security holder, or general partner has accepted the Plan. The failure to reference or discuss any particular provision of the Plan in the Findings and Conclusions or in this Order shall have no affect on the validity, binding effect and enforceability of such provision and such provision shall have the same validity, binding effect and enforceability as every other provision of the Plan.

28. This Order shall constitute all approvals and consents required, if any, by the laws, rules or regulations of the respective states of incorporation or organization of the Debtors, the Reorganized Debtors, or the Dismissed Debtors with respect to the implementation or consummation of the Plan and any other documents, instruments or agreements, and any amendments or modifications thereto, and any other acts referred to in or contemplated by the Plan and any other documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts that may be necessary or appropriate for the implementation or consummation of the Plan. This Order shall constitute the adoption and ratification by the partners, shareholders, and boards of directors of the Debtors, the Reorganized Debtors, or the Dismissed Debtors of any resolutions, documents, instruments, or agreements, and any amendments or modifications thereto, that may be necessary or appropriate under any such laws for such purposes.

29. The Plan and this Opinion and Order may be presented by any of the Debtors, the Reorganized Debtors, the Dismissed Debtors, the Non–Debtor Affiliates or any other entity, to any entity or court for filing, recording, or otherwise evidencing, enforcing, or acknowledging this Court's approval of the provisions of this Opinion and Order, the Plan, and any other documents, instruments, or agreements, and any amendments or modifications thereto, referred to in, contemplated by, or executed or delivered in connection with the Plan, or the rights, powers, privileges, authority, duties, or obligations provided therein, or any acts referred to or contemplated therein or taken in connection therewith.

30. Pursuant to section 1127 of the Bankruptcy Code and section 12.5 of the Plan, the Plan may be altered, amended or modified only by the Debtors or the Reorganized Debtors and the Dismissed Debtors before, on, or after the Confirmation Date pursuant to section 1127 of the Bankruptcy Code. The Plan may not be altered, amended, or modified without the written consent of the Debtors or the Reorganized

Debtors and the Dismissed Debtors, as the case may be.

If any or all of the provisions of this Order are hereafter modified, vacated, or reversed by subsequent order of this or any other court, such reversal, modification, or vacation shall not affect the validity of the obligations incurred or undertaken under or in connection with the Plan prior to the Reorganized Debtors' receipt of written notice of any such order; nor shall such reversal, modification, or vacation of this Order affect the validity or enforceability of such obligations. Notwithstanding any reversal, modification, or vacation of this Order, any such obligation incurred or undertaken pursuant to and in reliance on this Order prior to the effective date of such reversal, modification, or vacation shall be governed in all respects by the provisions of this Order, and the Plan and all documents, instruments and agreements related thereto, or any amendments or modifications thereto.

31. The attorneys for the Debtor shall promptly submit to this Court a proposed Notice of Entry of this Order which, upon approval by this Court, shall be mailed by the Debtors promptly, as provided in Bankruptcy Rule 2002(f), to all known creditors, equity security holders, and other parties in interest in this Case.

32. A copy of this Opinion and Order shall be mailed by the Debtors promptly to every entity that filed objections to the Plan that have not been withdrawn.

33. The Debtors shall file with this Court a copy of the confirmed Plan promptly after entry of this Order.

34. Notwithstanding Bankruptcy Rule 7062, this Order shall be effective and enforceable immediately upon entry.